## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

ROBERT EUGENE EASLEY,

      Plaintiff,

v.                                Case No.  5:20-cv-56-TKW/MJF

RICKY DIXON, *et al*.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff had incurred three "strikes" prior to commencing this civil action pursuant to 28 U.S.C. § 1983. Because he did not want to pay the filing fee, Plaintiff falsely alleged that he was in imminent danger of serious physical injury, and the undersigned provisionally granted Plaintiff leave to proceed *in forma pauperis*. Because Plaintiff made misrepresentations when he claimed to be in imminent danger, the District Court should revoke Plaintiff's leave to proceed *in forma pauperis* and dismiss this case without prejudice.

### I. BACKGROUND

**A.**    **Plaintiff Had Previously Incurred Three Strikes**

On February 10, 2020, Plaintiff commenced this action pursuant to 42 U.S.C. § 1983. Plaintiff also filed a motion for leave to proceed *in forma pauperis*. Doc. 2.

In his original complaint, Plaintiff acknowledged that he filed three cases that counted as a strike:

1. *Easley v. Ft. Lauderdale Police Dep't, et al.*, 0:11-cv-60713 (S.D. Fla. July 8, 2011) (dismissing Plaintiff's complaint for failure to state a claim on which relief may be granted, pursuant to § 1915(e)(2)(B)(ii));

2. *Easley v. Balmir, et al.*, 1:13-cv-22234 (S.D. Fla. May 12, 2014) (dismissing Plaintiff's complaint for failure to state a claim on which relief may be granted, pursuant to § 1915(e)(2)(B)(ii)); and

3. *Easley v. Inch, et al.,* 5:18-cv-148-TKW/MJF (N.D. Fla. Aug. 12, 2019) (dismissing Plaintiff's complaint for maliciousness and abuse of the judicial process, pursuant to §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

Doc. 1 at 4, 8; Doc. 6 at 5. Each of these cases constitutes a strike. Thus, Plaintiff could not proceed *in forma pauperis* absent a showing that he was in imminent danger of serious physical injury at the time of filing his original complaint.

## B. __Allegations of Imminent Danger in Plaintiff's Original Complaint__

To overcome the effect of his three strikes, Plaintiff alleged that he was in imminent danger of serious physical injury. Doc. 1 at 9–11. Specifically, Plaintiff alleged that he suffered from deep vein thrombosis ("DVT") or blood clots in his legs. He further alleged that the Florida Department of Corrections ("FDC") and Defendants refused to provide any treatment for his blood clots, and that this created a danger of serious injury and death:

- "I was denied doctors care and treatment for blood clots . . . ." Doc. 1 at 9.

- The FDC has "left me permanently incapacitated with irreversible life threatening clots." Doc. 1 at 9.

- "I'm not getting any treatment to [sic] my chronic conditions intentionally, in sadistic fashion . . . ." Doc. 1 at 11.

- "[N]ow my conditions are getting worse, more rapidly . . . ." Doc. 1 at 11.

- "I fear for my life all day every day." Doc. 1 at 11.

- Plaintiff's blood clot is causing additional clot problems and that "due to life threatening blood clots," he is "in the fear of imminent danger of death" Doc. 1 at 10.

Plaintiff also reiterated these allegations in his motion for a preliminary injunction noting that Defendants have placed "the Plaintiff in further imminent danger to his life, health, and safety, concerning his irreversible blood clot injurys, [sic] that has him in fear of imminent danger of death." Doc. 7 at 1.

## C.    The Undersigned Granted Plaintiff Leave to Proceed *IFP*

Because Plaintiff alleged that Defendants were not providing *any medical care* for Plaintiff's potentially life-threatening DVT, the undersigned was compelled to find that Plaintiff was in imminent danger of serious physical injury. The undersigned, therefore, granted Plaintiff leave to proceed *in forma pauperis*. Doc. 6. The undersigned, however, warned Plaintiff that the District Court could revoke

Plaintiff's *in forma pauperis* status if the District Court determined that Plaintiff "was not in imminent danger at the time he filed the complaint." *Id.* at 7–8. The undersigned also warned Plaintiff:

> If Plaintiff has misstated any fact in his complaint, he immediately should amend his complaint to correct any misstatement. All information submitted to this court **must be truthful.** Federal law prohibits submitting false information to the court and provides substantial penalties for false statements and misrepresentations.

*Id.* at 1.

On November 22, 2021, Defendants moved to revoke Plaintiff's *in forma pauperis* status and dismiss the original complaint. Doc. 45. Plaintiff responded in opposition. Doc. 48; Doc. 61; Doc. 61-1. Because Plaintiff's original complaint suffered from other deficiencies and Plaintiff had not yet had an opportunity to amend his original complaint, the undersigned afforded Plaintiff an opportunity to amend his complaint. Doc. 77. The undersigned reminded Plaintiff "that all information he submits to this court **must be truthful**." *Id.* at 18 n.7.

## D.    <u>Plaintiff's Amended Complaint Omits Mention of Imminent Danger</u>

Pursuant to the undersigned's order to correct deficiencies in his original complaint, Plaintiff filed an amended complaint. Doc. 86. In his first amended complaint, Plaintiff omitted his allegations that he was in "imminent danger of death" from the blood clots. Instead, he asserts in a conclusory fashion that "even a lay person knows untreated blood clots can kill a person." *Id.* at 8. While Plaintiff

focused his first amended complaint on conduct that occurred approximately two years before the filing of the original complaint, Plaintiff conceded that he had received some treatment at or around the time he filed his original complaint. *Id.* Thus, in his first amended complaint, Plaintiff contradicted statements he made— under the penalty of perjury—in his original complaint.

**E.**   **Plaintiff's Attempts to Avoid Appearing at the Evidentiary Hearing**

In light of Plaintiff's apparent contradictions, on December 1, 2022, the undersigned informed the parties that the undersigned would conduct an evidentiary hearing to determine whether Plaintiff was in imminent danger of serious physical injury at the time he commenced this action. Plaintiff immediately objected and took various actions to avoid having to appear at the evidentiary hearing. These include:

- On December 6, 2022, Plaintiff called the deputy clerk indicating that he received the court's order setting the hearing and he would be submitting an objection. He also—without a factual basis—accused the court of engaging in *ex parte* communication with the attorney general. He also asked that the hearing be telephonic so that he does not "lose his posture at . . . the incentivized camp" that he was housed at.

- On December 7, 2022, Plaintiff called the deputy clerk to complain that his classification officer received the court's December 1 order before

Plaintiff received it through legal mail and accused the undersigned of misconduct.

- On December 8, 2022, Plaintiff filed a motion for extension of time stating that he would not get medical records without prepayment or a court order.[1] Without any basis in fact, Plaintiff also accused the court that this court engaged in *ex parte* communications with Defendants. Doc. 93.

- On December 13, 2022, Plaintiff filed an objection seeking exclusion of his all of his medical records, recusal of the undersigned, and that any hearing be done telephonically. Doc. 96. Plaintiff sought a telephonic hearing because he was concerned about COVID-19 and the effect of a car ride on his DVT condition. The District Court overruled Plaintiff's objection. Doc. 99.

- On December 13, 2022, Plaintiff filed a motion for a court-appointed expert witness on his behalf and pro bono counsel. Doc. 97.

- On December 19, 2022, Plaintiff called the deputy clerk to advise that Plaintiff would be "sending via overnight delivery a check for $402." Doc. 95.

---

[1] In the order setting the hearing, the undersigned directed the FDC to provide copies of medical records to Plaintiff.

- On December 20, 2022, the clerk of the court received the check of $402 from Alba Diamond—Plaintiff's mother-in-law.

- On December 21, 2022, Plaintiff again called the deputy clerk about submitting payment of $402 for the filing fee.

- On December 22, 2022, Plaintiff filed a motion demanding the hearing be canceled because Alma Diamond had submitted a check for $402.00 on his behalf.

- On December 29, 2022, Plaintiff called the deputy clerk stating that his medical records were missing and acknowledging that the court ordered the FDC to provide Plaintiff the medical records.

- On January 4, 2023, Plaintiff called the deputy clerk stating that he had not received the court's orders from December 27 and December 30, 2022.

- On January 6, 2023, Plaintiff's wife called the deputy clerk asserting that Plaintiff could not make copies because he was in transit.[2]

**F.    <u>Testimony Elicited at the Evidentiary Hearing</u>**

On January 13, 2023, the undersigned conducted an evidentiary hearing. At the hearing, Defendants moved to admit two exhibits. Defendants' Exhibit 1 is a

---

[2] At the hearing, however, Plaintiff provided exhibits to the court and provided photocopies to Defendants' respective counsel. Apparently, therefore, he was able to make photocopies.

compilation of over 1,000 pages of Plaintiff's medical records,[3] which are under seal because the records contain personal-identifying information. Defendants' Exhibit 2 is a declaration of Nurse Kelli Caswell and over ninety pages of Plaintiff's medical records. The undersigned admitted both of Defendants' exhibits.

Plaintiff moved to admit five exhibits, including a declaration in which he asserts that Defendants delayed providing medical care for his DVT for 19 months. Doc. 111-1. The undersigned admitted those exhibits so they could be examined more closely after the hearing, but noted that some of the material was not relevant to the narrow question before the District Court. During the hearing, Plaintiff, Nurse Kelli Caswell, and Dr. John Lay, M.D., testified.[4]

---

[3] As the undersigned informed the parties at the hearing, the better practice would have entailed making each individual document/report a separate exhibit, redacting the personal-identifying information, and moving to admit the individual exhibits as opposed to one large mass of paper, most of which is not directly relevant to the narrow issue before the District Court. *See* N.D. Fla. Loc. R. 5.5.

[4] At the hearing Plaintiff stated that he wanted to call Curtis Filaroski as a witness, but he was unable to contact Mr. Filaroski because he did not have sufficient time because he received the order setting the hearing around "Christmas time." Upon questioning by the undersigned, Plaintiff conceded that he actually received the undersigned's order on December 6, 2022, *more than one month prior to the hearing*, and that he had made efforts to contact Mr. Filaroski, but that Mr. Filaroski did not contact Plaintiff despite Plaintiff's requests.

   Based on Plaintiff's testimony and his Exhibit B, it is clear that Mr. Filaroski did not have any firsthand knowledge regarding the medical treatment Plaintiff was receiving and had no personal knowledge of Plaintiff being in imminent danger. It was also apparent that Mr. Filaroski's testimony likely would be irrelevant to the particular issue, and most of his testimony would simply be inadmissible hearsay. *See* Plaintiff's Exhibit B.

### 1.   *Nurse Kelli Caswell's Testimony*

Ms. Caswell is a licensed nurse that works as a legal nurse consultant for the FDC. As part of her job, Ms. Caswell reviews medical records for litigation purposes, and Ms. Caswell testified that she had reviewed and was familiar with Plaintiff's medical records.

Ms. Caswell testified that as part of an inmate treatment plan, an inmate would receive "treatment" and monitoring. Treatment includes the "physical" aspect of the treatment plan, including providing medications.

Ms. Caswell explained that physicians typically prescribe the drug "Coumadin" to treat DVT. Additionally, she stated that nurses reviewed the medical charts of inmates who suffer from DVT, and if an inmate's PT/INR number was not within the paraments set by a physician, the nurse would inform a physician and the physician typically would prescribe Coumadin.[5]

Ms. Caswell further testified that Plaintiff's medical records reflected that Plaintiff was receiving treatment around the time he filed his original complaint: Plaintiff was prescribed and was receiving Coumadin and TED hose.[6] She also

---

[5] Nurse Caswell testified that a PT/INR is a lab conducted when a patient is given medication—such as Coumadin—orally. A PT/INR test is used to measure the speed at which blood clots.

[6] Nurse Caswell testified that physicians prescribe Coumadin to prevent a DVT from increasing in size and to prevent additional clots from forming. Defs' Ex. 2 at 5. Additionally, she testified that TED hose, which are compression stockings,

testified that medical staff—including nurses under the supervision of physicians—routinely monitored Plaintiff's condition by checking his PT/INR levels and referring his charts to the physicians.

Ms. Caswell further testified that "having a DVT is not necessarily a life-threatening emergency at that time. It would be determined by the physician on assessment whether or not there was a need for [emergency room care]."

Ms. Caswell also testified that no medical records indicated that, at or around the time Plaintiff filed his original complaint, Plaintiff's leg needed to be amputated, Plaintiff had a pulmonary embolism, or Plaintiff was in imminent danger of serious injury or death from his DVT.

## 2.    *Dr. John Lay's Testimony*

Dr. Lay testified that he is the state-wide medical director for Centurion of Florida, and is board certified in family medicine. In that capacity, Dr. Lay oversees all medical treatment for inmates and will review cases and provide guidance as needed.

Dr. Lay testified that he was involved in Plaintiff's treatment for his DVT at or around the time Plaintiff commenced this suit. Although Dr. Lay never personally

---

"mimic . . . walking or the compression of your lower leg to bring that blood up towards the heart where it should be so it doesn't pool in the leg." *See id.* TED hose can reduce the chance that blood will clot in the lower extremities and can help prevent swelling associated with a DVT. *Id.*

examined Plaintiff, he periodically reviewed Plaintiff's medical records and the results of Plaintiff's medical tests.

On or about September 24, 2019, Dr. Lay directed the medical staff to test Plaintiff's PT/INR level, and Dr. Lay instructed that Plaintiff's PT/INR range should be between 2.5 and 3. Defs' Ex. 1 at 164.[7] Indeed, Dr. Lay directed the medical staff to test Plaintiff's PT/INR level *every three days* until the PT/INR level was therapeutic and then check Plaintiff's PT/INR level *every seven days thereafter*. *Id.* Plaintiff's medical records confirm that the medical staff checked Plaintiff's PT/INR level as instructed.

Dr. Lay testified that Plaintiff's medical records reflected that the Centurion medical staff treated and monitored Plaintiff regarding his DVT from at least October 2019 through at least February 2020.[8] This treatment included anticoagulation therapy, specifically a prescription of Coumadin. Additionally, Dr. Lay testified that Plaintiff was prescribed compression socks.

Dr. Lay testified that the "most common" treatment for DVT is "anticoagulation therapy using oral medications," which Plaintiff was receiving in

---

[7] To refer to particular pages of Defendants' Exhibit 1, this report and recommendation refers to the Bates stamp numbers placed on the right lower corner of the pages of this exhibit.

[8] Recall that Plaintiff filed his original complaint on February 10, 2020, and it was at that point that he asserted, "I'm not getting any treatment to [sic] my chronic conditions intentionally, in sadistic fashion . . . ." Doc. 1 at 11.

2019 and 2020.[9] Additionally, Dr. Lay testified that in August 2019, the FDC sent Plaintiff to a vascular specialist and a hematologist/oncologist for consultation regarding the DVT. Dr. Lay testified that at the time of filing the original complaint, Plaintiff was not in imminent danger of serious physical injury due to DVT or a back injury Plaintiff had suffered in the past.

### 3.   *Plaintiff's Testimony*

Plaintiff testified that between January 4 and January 10, 2018—two years prior to commencing this lawsuit—he was in imminent danger because prison medical staff did not treat his DVT immediately. He also asserted that he, and anyone else who suffers from DVT, is and always will be in imminent danger of serious physical injury.

Plaintiff also testified that he had received "no treatment" for his DVT from medical personnel at Northwest Florida Reception Center because medical staff simply chose to "monitor" Plaintiff's DVT. He also asserted that because he has some discoloration of his foot and ankle he was and is in imminent danger of serious physical injury.

---

[9] "Medication is used to prevent and treat DVT. Compression stockings (also called graduated compression stockings) are sometimes recommended to prevent DVT and relieve pain and swelling." *What is a Venous Thromboembolism?*, Center For Disease Control and Prevention, https://www.cdc.gov/ncbddd/dvt/facts.html (last updated June 9, 2022).

## II. Findings of Fact

Based on the testimony elicited at the evidentiary hearing, the documentary evidence provided by the parties, and court records, the undersigned makes the following factual findings:

1.     Prior to the date Plaintiff commenced this civil action, Plaintiff had incurred three "strikes" pursuant to the Prison Litigation Reform Act. 28 U.S.C. § 1915(g).

2.     Prior to commencing this civil action, Plaintiff knew that he had incurred three strikes.

3.     Because Plaintiff had incurred three strikes prior to commencing this civil action, Plaintiff was required to pay the filing fee in full, unless he was in imminent danger of serious physical injury. 28 U.S.C. § 1915(g); *Dupree v. Palmer*, 284 F.3d 1234, 1236 (11th Cir. 2002).

4.     On February 10, 2020, Plaintiff commenced this action.

5.     Plaintiff did not pay the filing fee upon commencement of this civil action. Rather, Plaintiff claimed to be in imminent danger of serious physical injury. Doc. 1 at 9–11.

6.     Plaintiff included in his original complaint and his motion for preliminary injunction intentional misrepresentations designed by Plaintiff to

mislead the District Court and to cause the District Court to believe that Plaintiff was in imminent danger of serious physical injury. These include the following:

a.   "I was denied doctors care and treatment for blood clots . . . ." Doc. 1 at 9.

b.   The FDC has "left me permanently incapacitated with irreversible life threatening clots." Doc. 1 at 9.

c.   "I'm not getting any treatment to [sic] my chronic conditions intentionally, in sadistic fashion . . . ." Doc. 1 at 11.

d.   "[D]ue to life threatening blood clots," Plaintiff is "in the fear of imminent danger of death." Doc. 1 at 10.

7.   On October 7, 2020, based on Plaintiff's allegation that he was in imminent danger of serious physical injury, the undersigned granted Plaintiff leave to proceed *in forma pauperis*. The undersigned, however, instructed and warned Plaintiff:

If Plaintiff has misstated any fact in his complaint, he immediately should amend his complaint to correct any misstatement. All information submitted to this court **must be truthful.** Federal law prohibits submitting false information to the court and provides substantial penalties for false statements and misrepresentations.

Doc. 6 at 1.

8.   On August 18, 2022, the undersigned ordered Plaintiff to amend his complaint to correct deficiencies and warned Plaintiff that everything he submitted to the court must be truthful. Doc. 77.

9.    On November 16, 2022, Plaintiff filed an amended complaint and omitted his previous allegations of imminent danger. Plaintiff conceded in his amended complaint and during the hearing that he was receiving some medical care—including Coumadin—at or around the time of filing the original complaint.

10.    Contrary to Plaintiff's allegation that he was in imminent danger of serious physical injury at the time he commenced this civil action, the evidence shows that the FDC and Centurion provided Plaintiff with medical care before and around the time Plaintiff claimed he was in imminent danger of serious physical injury. This includes the following:

a.    On August 16, 2019, medical personnel transferred Plaintiff to Memorial Hospital of Jacksonville to be seen by a vascular surgeon, Dr. Danny Vo, M.D. Defs' Ex. 2 at 87–88[10]; Doc. 46-1 at 46. Dr. Vo noted that Plaintiff had complaints of "intermittent LLE edema and discoloration of foot." Defs' Ex. 2 at 88; Doc. 46-1 at 46. Dr. Vo conducted a physical examination and reported: (1) Plaintiff's lower left leg was warm with mild edema,[11] and (2) Plaintiff had normal motor and sensory function. Dr. Vo concluded that there was "[n]o role for vascular surgery intervention." Dr. Vo recommended an evaluation by a Hematologist for a coagulopathy disorder and medical management. Defs' Ex. 2 at; Doc. 46-1 at 46.

b.    On September 10, 2019, medical personnel measured Plaintiff's PT/INR level. It was 1.85. Medical personnel increased Plaintiff's dosage of Coumadin and scheduled another PT/INR measurement for September 16, 2019. Plf's Ex. F at 8

---

[10] Defendants' Exhibit 2 is on the docket at Doc. 37-1.

[11] "Edema" is swelling caused by the accumulation of fluid in a particular part of one's body.

c.  On September 18, 2019, medical personnel again measured Plaintiff's PT/INR level. It was 1.61. Medical personnel increased Plaintiff's dosage of Coumadin and ordered that Plaintiff's PT/INR level be checked in seven days. Plf's Ex. F at 31.

d.  On September 25, 2019, medical personnel again measured Plaintiff's PT/INR level. It was 1.9. Staff noted this level was almost therapeutic and that they again would measure Plaintiff's PT/INR level within seven days. Defs' Ex. 1 at 165; Plf's Ex. F at 11.

e.  On September 26, 2019, nursing staff referred Plaintiff's medical chart to Dr. Lay. Dr. Lay ordered that staff again check Plaintiff's PT/INR level on September 27, 2019. Defs' Ex. 1 at 165.

f.  On September 27, 2019, medical personnel again measured Plaintiff's PT/INR level. It was 2.1. Defs' Ex. 1 at 165.

g.  On October 2, 2019, medical personnel again measured Plaintiff's PT/INR level. It was 2.1. These results were referred to a clinician who increased Plaintiff's dosage of Coumadin. Defs' Ex. 1 at 163.

h.  On October 7, 2019, medical personnel again measured Plaintiff's PT/INR level. It was 3.1. Defs' Ex. 1 at 162; Plf's Ex. F at 10.

i.  On October 14, 2019, medical personnel again measured Plaintiff's PT/INR level, which was 3.2. Defs' Ex. 1 at 161; Plf's Ex. F at 9.

j.  On October 24, 2019, Dr. Vernon Montoya, M.D., examined Plaintiff. Doc. 37-1 at 89–90. Dr. Montoya noted that Plaintiff had "[n]o clubbing, cyanosis, or edema" in his extremities."[12]

---

[12] "Cyanosis" is the discoloration in a limb due to lack of oxygenation.

Defs' Ex. 2 at 90. Dr. Montoya ordered tests to check for coagulopathy disorders. *Id.* Dr. Montoya found that Plaintiff was not a candidate for a thrombectomy, and that Plaintiff needed to continue the Coumadin regimen. *Id.* Dr. Montoya recommended that Plaintiff's PT/INR level be maintained between 2 and 3, and that he would err on the high end of that range. *Id.* Dr. Montoya also recommended a follow-up appointment. *Id.*

k.  Also on October 24, 2019, medical personnel scheduled the follow-up appointment with Dr. Montoya. Defs' Ex. 1 at 156.

l.  On October 29, 2019, Dr. A. Acevedo, M.D., examined Plaintiff at the Cardiovascular Chronic Illness Clinic. Many of his notes are illegible, but Dr. Acevedo ordered a measurement of Plaintiff's PT/INR level, which was done on February 4, 2020— *just six days before Plaintiff filed this civil action*. Dr. Acevedo also ordered a follow-up appointment for February 12, 2020, at the Chronic Illness Clinic. Defs' Ex. 1 at 158.

m.  On November 5, 2019, medical personnel again measured Plaintiff's PT/INR level. It was 3.7. Defs' Ex. 1 at 150.

n.  On November 16, 2019, Plaintiff was seen by medical personnel for a follow-up appointment for something other than Plaintiff's DVT. The clinician noted that Plaintiff did not present with edema. Defs' Ex. 1 at 149.

o.  On December 3, 2019, medical personnel again measured Plaintiff's PT/INR level. It was 3.28. Plf's Ex. F at 35.

p.  On December 4, 2019, Dr. L. Vazquez-Alvardo, M.D., reviewed Plaintiff's medical records and authorized a regimen of Coumadin consistent with Dr. Montoya's recommendation. Dr. Vazquez-Alvardo noted that Plaintiff's PT/INR level should be checked again in three weeks. Defs' Ex. 1 at 145.

q.    On December 5, 2019, Dr. Montoya examined Plaintiff and indicated that Plaintiff needed to be treated with anticoagulants for the rest of his life. Defs' Ex. 1 at 157.

r.    On December 27, 2019, medical personnel again measured Plaintiff's PT/INR level. It was 2.8. Defs' Ex. 1 at 133.

s.    On February 4, 2020—*just six days before Plaintiff filed his original complaint and alleged that he was "not getting any treatment to [sic] my chronic conditions intentionally, in sadistic fashion,"* medical personnel performed various laboratory tests and reviewed the results. Defs' Ex. 1 at 113, 158; Plf's Ex. F at 33.

t.    On February 11, 2020—*the day after Plaintiff filed his original complaint in which he claimed to be in imminent danger of serious physical injury*—Plaintiff was seen at the Cardiovascular and Endocrine Chronic Care Clinic consistent with Dr. Acevedo's treatment plan. Medical personnel again measured Plaintiff's PT/INR level, which was 2.88. Additionally, staff noted that in his extremities Plaintiff had no clubbing, cyanosis, or edema. Defs' Ex. 1 at 113. Medical personnel did not note any condition which indicated that Plaintiff was in imminent danger of serious physical injury.

u.    On March 19, 2020, Plaintiff's PT/INR level was 1.19. Medical staff increased the dosage of Coumadin. Medical staffed ordered a PT/INR lab to recheck Plaintiff's PT/INR level. This was scheduled for March 28, 2020. Plf's Ex. F at 6.

v.    On March 28, 2020, medical personnel again measured Plaintiff's PT/INR level. It was 3.1. Medical personnel ordered that Plaintiff's PT/INR level be measured again on April 2, 2020. Defs' Ex. 1 at 105.

w.    On April 3, 2020, medical personnel again measured Plaintiff's PT/INR level. It was 3.7. Plf's Ex. F at 12.

x.  On May 6, 2020, medical personnel again measured Plaintiff's PT/INR level. It was 3.41. Plf's Ex. F at 32.

y.  On May 13, 2020, Plaintiff was seen at the Chronic Care Clinic. There was no evidence of edema, clubbing, or cyanosis in his extremities. Defs' Ex. 1 at 112.

z.  Between February 23, 2020, and April 21, 2020, Dr. V. Benjamin and ARNP Bottkol routinely prescribed Coumadin for Plaintiff's DVT. Defs' Ex. 1 at 127–32.

11.  Nurse Caswell and Dr. Lay credibly testified that Plaintiff's medical records reflected that Plaintiff was receiving treatment for his DVT at or near the time Plaintiff filed this lawsuit and that Plaintiff was not in imminent danger.

12.  Dr. Lay and Nurse Caswell testified that treatment with Coumadin is the standard treatment for individuals suffering from DVT.

13.  At the evidentiary hearing, when the undersigned asked Plaintiff what additional medical care Defendants should have provided to Plaintiff around the time that Plaintiff claimed he was in imminent danger, *Plaintiff could not identify any*.

14.  Plaintiff was not in imminent danger of serious physical injury when he commenced this civil action on February 10, 2020.

15.  Plaintiff did not believe he was in imminent danger of serious physical injury when he commenced this civil action on February 10, 2020.

16.    No reasonable person in Plaintiff's position and who possessed the information Plaintiff possessed on February 10, 2020, would have believed that he was in imminent danger of serious physical injury.

17.    Plaintiff opposed the undersigned conducting an evidentiary hearing to determine if Plaintiff had been in imminent danger because Plaintiff knew that he had not been in imminent danger at the time he commenced this civil action. Plaintiff's effort included:

    a.    expeditiously paying the clerk of the court the portion of the filing fee that remained due[13];

    b.    filing two motions for extension of time which claimed that Plaintiff could not prepare for the evidentiary hearing because he did not have the relevant medical records;

    c.    objecting to the hearing based on "invasion of privacy" and because Plaintiff purportedly feared contracting COVID-19; and

    d.    on at least six occasions, calling—or having his wife call—a deputy clerk of the court to state that Plaintiff objected to the hearing, that he was sending a check for $402 by overnight

---

[13] Plaintiff arranged for a check for $402 to be sent overnight to the clerk of the court. Docs. 95, 98. Because the undersigned had granted Plaintiff leave to proceed *in forma pauperis* and Plaintiff already had paid some of the partial filing fee, the clerk of the court collected only the amount required to satisfy Plaintiff's outstanding obligation. Doc. 98.

delivery that allegedly would obviate the need for the evidentiary hearing, that he did not have the money to purchase medical records from the medical department, and noting that medical records purportedly were missing.

### III. DISCUSSION

A federal court may authorize the commencement of a civil action by an impoverished prisoner who demonstrates that he "is unable to pay such fees." 28 U.S.C. § 1915(a)(1). A prisoner who has filed three or more actions that were dismissed for frivolity, maliciousness, or failure to state a claim is not entitled to proceed *in forma pauperis*, however. *Id.* § 1915(g).

A plaintiff who is barred from proceeding *in forma pauperis* by the "three strikes" rule must pay the filing fee at the time he initiates his lawsuit, and failure to do so warrants dismissal of his case without prejudice. *See Dupree*, 284 F.3d at 1236; *Vanderberg v. Donaldson*, 259 F.3d 1321, 1324 (11th Cir. 2001). An exception to this rule arises when a prisoner alleges that he is "under imminent danger of serious physical injury." 28 U.S.C. § 1915(g); *see also Brown v. Johnson*, 387 F.3d 1344, 1349 (11th Cir. 2004). In order for the imminent-danger exception to apply, a plaintiff must allege that at the time of filing he was in "imminent danger of serious physical injury." *Brown*, 387 F.3d at 1350. The imminent-danger exception to section 1915(g)'s "three strikes" rule is construed narrowly and is available only "for

genuine emergencies," where "time is pressing," and when a threat is "real and proximate." *Lewis v. Sullivan*, 279 F.3d 526, 531 (7th Cir. 2002).

A court may revisit its initial determination that a prisoner-litigant was in imminent danger. *McLeod v. Sec'y, Fla. Dep't of Corr.*, 778 F. App'x 663, 665 (11th Cir. 2019); *Shepherd v. Annucci*, 921 F.3d 89, 94–95 (2d Cir. 2019); *Taylor v. Watkins*, 623 F.3d 483, 485 (7th Cir. 2010); *Fuller v. Myers*, 123 F. App'x 365, 368 (10th Cir. 2005). If a court determines that a prisoner was not in imminent danger when he filed his compliant, the court may revoke the plaintiff's leave to proceed *in forma pauperis*. *McLeod*, 778 F. App'x at 665; *Shepherd*, 921 F.3d at 94–95; *Taylor*, 623 F.3d at 485; *Fuller*, 123 F. App'x at 368.

## A.    <u>The Evidence Demonstrates that Plaintiff Was Not in Imminent Danger</u>

Plaintiff's allegation in his original complaint that the FDC refused to provide him any medical care or appointments with physicians is contradicted by the medical records, by the testimony at the evidentiary hearing, and by exhibits submitted by Plaintiff himself.[14]

Centurion physicians regularly prescribed Coumadin and compression hose to Plaintiff, and this treatment was administered through Centurion nurses. Defs'

---

[14] Plaintiff signed his original complaint under the penalty of perjury. Additionally, under Rule 11, Plaintiff certified that based on his knowledge, information, and belief informed after an inquiry reasonable under the circumstances, that his factual contentions had evidentiary support. Fed. R. Civ. P. 11(b). It appears, therefore, that Plaintiff committed perjury and violated Rule 11.

Ex. 2 at 7, 8, 12, 21–81, 82–89, 93–94, 101–04. Notably, this treatment plan was endorsed by two consultative physicians. Plaintiff's medical records also reflect that he received Coumadin daily and that the FDC regularly monitored his PT/INR levels, which routinely were within the appropriate limits. Plf's Ex. F at 3, 6–11, 31–33, 35; Defs' Ex. 1 at 89–90, 105, 112–13, 133, 145, 150, 156–58, 161–65. None of the physicians or nurses who examined Plaintiff ever indicated in their notes that Plaintiff was in imminent danger of serious physical injury. At the evidentiary hearing, when ask what additional treatment should have been provided to him around the time he filed his original complaint, Plaintiff could not identify any treatment he should have received at that time.[15]

When a plaintiff is receiving medical care he is not in "imminent danger of serious physical injury" for purposes of 28 U.S.C. § 1915(g). *O'Connor v. Suwanee Corr. Inst.*, 649 F. App'x 802, 804–05 (11th Cir. 2016) (affirming district court's denial of IFP status when the plaintiff had not experienced a "complete withdrawal of treatment" and instead had been seen by medical personnel multiple times and

---

[15] The fact that Plaintiff may have been in imminent danger in 2018 does not in itself permit him to claim that he was in imminent danger in February 2020 when he commenced this civil action. *Medberry v. Butler*, 185 F.3d 1189, 1193 (11th Cir. 1999) ("Congress's use of the present tense in § 1915(g) confirms that a prisoner's allegation that he faced imminent danger sometime in the past is an insufficient basis to allow him to proceed *in forma pauperis* pursuant to the imminent danger exception to the statute.").

was informed that he needed surgery); *Simmons v. Clark*, 88 F. App'x 275 (9th Cir. 2004) (unpublished opinion) (affirming district court's conclusion that plaintiff was not in imminent danger of serious physical injury when plaintiff "received frequent medical examinations, diagnostic studies, and physical therapy for his back pain"); *Gaither v. Bryson*, No. CV 121-001, 2021 WL 1015849, at *2 n.3 (S.D. Ga. Jan. 25, 2021) (concluding that a plaintiff's medical claim that does not allege a complete absence of all treatment for his ankle as opposed to a preference for a different type of treatment is insufficient to satisfy the imminent-danger exception), *report and recommendation adopted*, 2021 WL 1015884 (S.D. Ga. Mar. 16, 2021); *see McLeod*, 778 F. App'x at 665 (affirming district court's revocation of IFP status when the evidence demonstrated that the inmate's condition was being monitored, his test results were within normal ranges, and there was no indication in the record that the inmate was in imminent danger of physical injury from his hepatitis C).

As for Plaintiff's other medical conditions—back pain and hammer toes—these were not the focus of Plaintiff's allegation that he was in imminent danger of serious physical injury. Plaintiff provides only non-specific allegations that these conditions placed him in imminent danger of physical injury. Indeed, at the evidentiary hearing, Plaintiff only alleged that they caused him pain and alleged generally that there was rapid deterioration of his condition. This is insufficient to meet his burden of showing imminent danger at the time Plaintiff filed his original

complaint. *See O'Connor v. Sec., Fla. Dept. of Corr.*, 732 F. App'x. 768, 769–71 (11th Cir. 2018) (allegations of worsening "acid reflux, heartburns, regurgitation, pains, etc." did not constitute serious physical injury); *White v. Colorado*, 157 F.3d 1226, 1231–32 (10th Cir. 1998) (affirming denial of IPF when complaint contains *non-specific* allegations); *Dickson v. U.S.*, No. 5:16-cv-215-P/CJK, 2016 WL 6078330, at *2 (N.D. Fla. Aug. 8, 2016) (allegations of chronic knee pain due to osteoarthritis and bone spurs did not constitute imminent danger of serious physical injury), *report and recommendation adopted*, 2016 WL 6070074 (N.D. Fla. Oct. 14, 2016).

In sum, the evidence unequivocally demonstrates that Plaintiff was not in imminent danger of serious physical injury when he commenced this civil action, and therefore, he was not entitled to proceed *in forma pauperis*. The undersigned, therefore, recommends that Plaintiff's *in forma pauperis* status be revoked and that the District Court dismiss this civil action without prejudice.

**B.    <u>Plaintiff's Effort to Avoid Adverse Findings Does Not Preclude Dismissal</u>**

Because Plaintiff knew he was not in imminent danger at the time he commenced this suit, after the undersigned informed the parties of his intent to hold an evidentiary hearing, Plaintiff arranged for his family to pay the filing fee. On December 19, 2022, Alma Diamond—Plaintiff's mother in-law—sent at check via

overnight mail to the clerk of the court. Plaintiff contends that this should preclude the dismissal of this action. Docs. 95, 98.

The Eleventh Circuit has held that an inmate who has incurred three strikes and who is not in imminent danger of serious physical injury must pay the filing fee *at the time he commences the lawsuit*. *Dupree*, 284 F.3d at 1236 (holding that "the proper procedure is for the district court to dismiss the complaint without prejudice when it denies the prisoner leave to proceed *in forma pauperis* pursuant to the provisions of § 1915(g)," because the prisoner "must pay the filing fee at the time he initiates the suit"); *Vanderberg*, 259 F.3d at 1324 (stating that after three meritless suits, a prisoner must pay the full filing fee at the time he initiates suit). That is, a plaintiff "cannot simply pay the full filing fee at this stage of his case and continue on with his current case." *McLeod v. Jones*, No. 4:15-CV-188-RH/GRJ, 2015 WL 9598791, at *5 (N.D. Fla. Sept. 17, 2015), *report and recommendation adopted*, 2016 WL 47875 (N.D. Fla. Jan. 4, 2016), *aff'd sub nom. McLeod*, 778 F. App'x at 666.

Furthermore, by alleging under penalty of perjury in his original complaint that he was in imminent danger, Plaintiff engaged in bad faith and employed a manipulative tactic. Providing false information to the court undermines the administration of justice and is sanctionable conduct. To punish such activity and deter both Plaintiff and other litigants from committing such conduct in the future,

the District Court should dismiss this civil action without prejudice. *See generally Attwood v. Singletary*, 105 F.3d 610, 613 (11th Cir. 1997) (holding that if a plaintiff engaged in "bad faith litigiousness or manipulative tactics" regarding the filing fee, the court may dismiss the action); *see Fair v. Gaiter*, No. 20-11599, 2022 WL 1102017, at *1 (11th Cir. Apr. 13, 2022) ("Dismissal with prejudice is justified if 'the plaintiff engaged in bad faith litigiousness or manipulative tactics,' such as lying about their indigency or otherwise abusing the judicial process.")

## IV. CONCLUSION

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that the District Court **DISMISS** this action without prejudice.[16]

At Pensacola, Florida, this 24th day of January, 2023.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

---

[16] Plaintiff alleges that Defendants have and continue to deny him accommodations under the ADA, he was denied appropriate medical care from January 10, 2018 through August 10, 2019, and the FDC has failed to follow a specialist's recommendation regarding Plaintiff's DVT, which he asserts is a "flat denial of medical care." Doc. 86 at 7–8. Insofar as Plaintiff alleges that these are continuing violations of his rights, Plaintiff presumably can re-assert these claims in a new lawsuit upon payment of the filing fee. *See Lavellee v. Listi*, 611 F.2d 1129, 1132 (5th Cir. 1980) (noting that a failure to provide medical care constitutes a continuing tort which does not accrue until the date medical attention is provided).

## NOTICE TO THE PARTIES

**The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b). Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636. If the parties dispute the accuracy of any facts taken from judicially-noticed documents, or if they otherwise wish to be heard on the propriety of the court taking judicial notice of those facts, they must raise this issue in an objection to this report and recommendation.**